LEE, P.J.,
 

 for the Court.
 

 PROCEDURAL HISTORY
 

 ¶ 1. A jury in the Lowndes County Circuit Court found Michael Gene Ray guilty of murder. Ray was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. Ray subsequently filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. The motion was denied, and Ray filed this appeal. In his appeal, Ray raises several issues, which we state verbatim:
 

 (1) Whether the trial court erred when it overruled the appellant’s motion for JNOV because the actions of the appellant were clearly in line with Mississippi statutory law allowing for excusable homicide in cases of self-defense.
 

 (2) Whether the trial court erred when it overruled the appellant’s motion for a new trial because the overwhelming weight of the evidence pointed towards excusable homicide in self-defense and not murder.
 

 
 *419
 
 (3) In the alternative, whether the trial court erred when it failed to grant [the] appellant his motion for a new trial on the grounds that [the] overwhelming weight of the evidence pointed towards manslaughter rather than murder.
 

 (4) In the alternative, whether the trial court erred when it denied the appellant’s motion for a JNOV because the evidence was insufficient to support a verdict of murder, and instead, support a verdict of manslaughter.
 

 (5) Whether the circuit court erred in failing to properly consider the appellant’s motion to dismiss for a violation of his statutory right to a speedy trial.
 

 (6) Whether the circuit court erred in failing to properly consider the appellant’s motion to dismiss for a violation of his constitutional right to a speedy trial.
 

 (7) Whether trial counsel’s ineffectiveness deprived [the] appellant of his constitutionally mandated right to a fair trial.
 

 FACTS
 

 ¶2. On June 17, 2005, Danny Hudson (Hudson) was drinking alcohol at the Slab House, a bar in Caledonia, Mississippi. Ray and his mother, Doris Ray, lived in a trailer diagonally across the road from the Slab House. Ray’s sister, Sheila Ray (Sheila), was Hudson’s girlfriend at the time of his death, and Sheila, along with Alicia, her daughter with Hudson, also lived in the trailer with Ray and Doris.
 

 ¶ 3. Doris was the bartender at the Slab House and began her shift that day at approximately 4:00 p.m. Doris testified that Hudson and Sheila came into the bar sometime after her shift started. At one point, Sheila became angry with Hudson for speaking with another woman and left the bar. Renee Taylor, a patron at the Slab House, testified that she saw Sheila slap Hudson. Hudson eventually followed Sheila home, and she testified that he kicked in the trailer door. Sheila testified that she failed to notify the police of this during the investigation of Hudson’s death. The two talked for a while, began fighting again, left the trailer, and headed to the bar. Sheila testified that Hudson tried to prevent her from entering the bar by grabbing her hair. However, Doris testified that Hudson had Sheila by the arm, not her hair. Thresa Sorrells, a Slab House patron, also testified that Hudson was holding Sheila by her shirt and not her hair.
 

 ¶ 4. Sheila eventually went home and told Ray about her altercation with Hudson. Sheila went inside the trailer. Ray testified that he went to confront Hudson and carried a piece of pipe with him. Ray stated that he carried the pipe to let Hudson know “I was coming after him.” According to Ray, Hudson tackled him, kicked him twice, and busted his lip. James Wright, the owner of the Slab House, broke up the fight. Wright took the pipe away from Ray and threw it in a dumpster. Wright testified that Hudson was not holding a weapon. Mark Boch, a patron at the Slab House, assisted Wright in breaking up the fight. Boch testified that he never saw any blows; it looked like Hudson and Ray were wrestling. Wright and Boch testified that Hudson and Ray left the scene without any further incident.
 

 ¶ 5. At one point, Hudson came back to the Slab House looking for Sheila and Alicia. Doris testified that she told him they were at the house, but he should leave them alone. At trial, Doris stated that she heard Hudson say to Wright, “I’m gonna kill that son-of-a-bitch.” Doris failed to mention this statement to the police, and Wright stated that he did not see Hudson again after he broke up the fight.
 

 
 *420
 
 ¶ 6. Ray testified that he was sitting on a picnic bench near the trailer when he saw Hudson walking across the street toward him. Ray stated that Hudson picked up a rock and threw it at him, hitting him in the head and arm. Ray testified that he then picked up a knife, and as Hudson was attempting to throw another rock at him, he stabbed Hudson in the side. Ray then turned, entered the trailer, washed up, and left the scene. Alicia testified that she saw Hudson throw a rock at Ray, but Ray had a knife in his hand before Hudson picked up the rock. Taylor testified that she saw Ray with a large steak knife. Taylor testified that she attempted to stop the fight, but Ray turned to her with the knife and told her to shut her mouth. Taylor stated that Ray then turned to Hudson and stabbed him in the side. Taylor said that Hudson then grabbed his side, took a couple of steps, and fell to one knee. Taylor testified that Hudson was not holding anything in his hands nor was he advancing upon Ray. Ray stated that Hudson had backed him up to the trailer steps, but Taylor testified that the stabbing occurred in the gravel area near the road. There was blood spatter on the gravel near the road close to the area where Taylor said the stabbing had occurred.
 

 ¶ 7. Sheila testified that Hudson kept advancing on Ray. Sheila also stated that Hudson was holding a rock, but she failed to include this in her statement to the police. Sheila stated that she was not aware at first that Hudson had been stabbed. When Hudson fell to the ground, Sheila attempted to retrieve his wallet because she had been told it contained marijuana. Hudson was taken to the hospital where he died the next morning.
 

 ¶ 8. The knife used by Ray was never found. Dr. Steven Hayne, a pathologist, testified that Hudson had died from a massive intra-abdominal hemorrhage. Dr. Hayne stated that the knife penetrated Hudson’s spleen, kidney, and pancreas, and the blade was approximately five and one-half to six inches long. Ray turned himself in at the Lowndes County Sheriffs Department the next morning.
 

 DISCUSSION
 

 I. DID THE TRIAL COURT ERR IN FAILING TO GRANT RAY’S MOTION FOR A JNOV BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE MURDER CONVICTION?
 

 II. DID THE TRIAL COURT ERR IN FAILING TO GRANT RAY’S MOTION FOR A JNOV BECAUSE THE EVIDENCE ONLY SUPPORTED A CONVICTION FOR MANSLAUGHTER?
 

 ¶ 9. Ray contends that the trial court erred in failing to grant his motion for a JNOV because the evidence was insufficient to support his murder conviction and because the evidence only supported a manslaughter conviction. A motion for a JNOV challenges the sufficiency of the evidence.
 
 Bush v. State,
 
 895 So.2d 836, 843(¶ 16) (Miss.2005). “[T]he critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed.’ ”
 
 Id.
 
 (citation omitted). If, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, the essential elements of the crime existed, this Court will affirm the denial of a motion for a JNOV.
 
 Id.
 
 If we find that reasonable, fair-minded jurors could have concluded that the defendant was guilty of the accused crime, the evidence will be deemed sufficient.
 
 Id.
 

 ¶ 10. Ray specifically contends that the State failed to prove that his actions were
 
 *421
 
 not in necessary self-defense or that he acted with deliberate design to commit the murder. Ray was indicted pursuant to Mississippi Code Annotated section 97-3-19 (Rev.2006), which states, in pertinent part, that “(1) [t]he killing of a human being without the authority of law by any means or in any manner shall be murder ... (a) [w]hen done with deliberate design to effect the death of the person killed.... ” The indictment tracked the statutory language adding the following phrase: “and not in necessary self[-]defense.”
 

 ¶ 11. Ray cites to two specific statutes to support his argument. Mississippi Code Annotated section 97-3-17 (Rev. 2006) provides that a homicide “shall be excusable: (a) [w]hen committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intend’ Mississippi Code Annotated section 97-3-15 (Rev.2006) states, in pertinent part, the following:
 

 (1) The killing of a human being by the act, procurement or omission of another shall be justifiable in the following cases:
 

 [[Image here]]
 

 (e) When committed by any person in resisting any attempt unlawfully to kill such person or to commit any felony upon him, or upon or in any dwelling, in any occupied vehicle, in any place of business, in any place of employment or in the immediate premises thereof in which such person shall be;
 

 (f) When committed in the lawful defense of one’s own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished ....
 

 ¶ 12. Manslaughter is defined as “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense....” Miss. Code Ann. § 97-3-35 (Rev.2006).
 

 ¶ 13. Ray claims that the facts support either excusable or justifiable homicide or manslaughter, namely because of the prior altercation between him and Hudson and because of the testimony that two landscaping rocks had been moved, thus proving that Hudson intended to harm him. However, we find that the facts were conflicting and, at best, created a question for the jury. Ray admitted that, prior to the stabbing, he went to confront Hudson and was carrying a pipe to get Hudson’s attention. Doris’s statement that she heard Hudson tell Wright that he was going to kill Ray was not supported by Wright’s testimony. Taylor consistently testified that Ray and Hudson were each standing his ground and not advancing upon each other. Taylor, as well as the physical evidence, contradict Ray’s testimony that Hudson backed him up to the trailer steps, implying that Ray had no choice but to stab Hudson. Taylor stated that as she attempted to talk to Ray and Hudson, Ray turned to her, told her to be quiet, then turned back to Hudson and stabbed him. Alicia testified that Ray had picked up the knife before Hudson picked up a rock. Taylor testified that Hudson was not holding anything at the time of the stabbing. Furthermore, Ray left the scene immediately after the stabbing, creating the impression for the jury that he knew Hudson was no longer a threat. The jury was instructed to consider whether the killing of Hudson was murder, manslaughter, or committed in self-defense. We find that the jury had sufficient evidence to convict Ray of murder. This issue is without merit.
 

 
 *422
 
 III. WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE BECAUSE THE EVIDENCE PROVED SELF-DEFENSE AND NOT MURDER?
 

 IV. WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE BECAUSE THE EVIDENCE SUPPORTED A MANSLAUGHTER CONVICTION?
 

 ¶ 14. Ray next argues that the overwhelming weight of the evidence did not support a murder conviction. Specifically, Ray contends that the evidence supported his claim of self-defense. In the alternative, Ray contends that the evidence supports imperfect-self-defense manslaughter or heat-of-passion manslaughter. “When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush,
 
 895 So.2d at 844(¶ 18). “[T]he evidence should be weighed in the light most favorable to the verdict.”
 
 Id
 

 ¶ 15. “A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, ‘unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict.’ ”
 
 Id
 
 (quoting
 
 McQueen v. State,
 
 423 So.2d 800, 803 (Miss.1982)). Rather, it means that this Court, sitting as the “thirteenth juror,” simply disagrees with the jury’s resolution of the conflicting testimony.
 
 Id
 

 ¶ 16. Viewing the evidence in the light most favorable to the verdict, we find that the verdict was not against the overwhelming weight of the evidence. As previously stated, the testimony at trial presented a factual dispute for the jury’s resolution. The jury found Taylor’s testimony to be credible and Ray’s attempts to establish a self-defense theory to be contradictory.
 

 1117. Ray cites to Mississippi Code Annotated section 97-3-31 (Rev.2006), which provides for a manslaughter conviction when an individual unnecessarily kills another while resisting an effort by the other to commit a felony. However, weighing the evidence in the light most favorable to the verdict, there was conflicting testimony as to whether Hudson was attempting to commit a felony. There was testimony that: Hudson was walking to Ray’s house; he was unarmed; and he was not making any aggressive gestures or remarks to suggest to Ray that he was planning to harm Ray.
 

 ¶ 18. Ray also claims that the evidence overwhelmingly supported a “heat-of-passion” manslaughter conviction. Our case law has defined heat of passion as follows:
 

 A state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
 

 Clemons v. State,
 
 952 So.2d 314, 319(¶ 14) (Miss.Ct.App.2007). There was no evidence that Ray was acting in a state of violent and uncontrollable rage. Ray only attempted to show that he was afraid of Hudson and acted in self-defense. We find that this issue is without merit.
 

 V.DID THE TRIAL COURT ERR IN DENYING RAY’S MOTION TO DISMISS FOR A VIOLATION OF HIS STATUTORY RIGHT TO A SPEEDY TRIAL?
 

 
 *423
 
 ¶ 19. Ray contends that the trial court erred in denying his motion to dismiss for a violation of his statutory right to a speedy trial. Our standard of review in claims of speedy trial violations is as follows:
 

 Review of a speedy trial claim encompasses the fact question of whether the trial delay rose from good cause. Under [the appellate court’s] standard of review, [the appellate court] will uphold a decision based on substantial, credible evidence. If no probative evidence supports the trial court’s finding of good cause, [the appellate court] will ordinarily reverse. The [S]tate bears the burden of proving good cause for a speedy trial delay, and thus bears the risk of non-persuasion.
 

 DeLoach v. State,
 
 722 So.2d 512, 516(¶ 12) (Miss.1998) (citations omitted). Ray states that his statutory right to a speedy trial was violated pursuant to Mississippi Code Annotated section 99-17-1 (Rev.2007), which states as follows:
 

 Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.
 

 Ray’s arraignment hearing was on August 18, 2005. Due to various continuances by Ray, including an almost two-year wait for a mental examination, and other matters, Ray was not tried until February 21, 2008, well past the 270-day deadline. However, we have held that if a defendant fails to raise the statutory right to a speedy trial within 270 days of his arraignment, he acquiesces to the delay.
 
 Mims v. State,
 
 856 So.2d 518, 522(¶ 11) (Miss.Ct.App.2003);
 
 Malone v. State,
 
 829 So.2d 1253, 1257(¶ 11) (Miss.Ct.App.2002).
 
 See also Walton v. State,
 
 678 So.2d 645, 649-50 (Miss.1996). Ray filed his first motion to dismiss for failure to provide a speedy trial on September 24, 2007. This argument is without merit.
 

 VI. DID THE TRIAL COURT ERR IN DENYING RAY’S MOTION TO DISMISS FOR A VIOLATION OF HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL?
 

 ¶ 20. Ray argues that his constitutional right to a speedy trial was violated under the factors set out by the United States Supreme Court in
 
 Barker v. Wingo,
 
 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Since there is no set amount of time within which a defendant must be brought to trial, the United States Supreme Court has developed a balancing test to determine whether a defendant’s constitutional rights to a speedy trial have been violated.
 
 See Barker,
 
 407 U.S. at 530, 92 S.Ct. 2182. The four factors to be considered together and balanced are: (1) the length of delay, (2) the reason for the delay, (3) the defendant’s assertion of his right, and (4) prejudice to the defendant.
 
 Id.
 
 at 530-32, 92 S.Ct. 2182;
 
 Stark v. State,
 
 911 So.2d 447, 450(¶ 7) (Miss.2005).
 

 A. Length of the delay
 

 ¶ 21. Under
 
 Barker,
 
 “[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.”
 
 Barker,
 
 407 U.S. at 530, 92 S.Ct. 2182. In Mississippi, any delay from the date of arrest, indictment, or information until trial exceeding eight months is presumptively prejudicial.
 
 Stark,
 
 911 So.2d at 449-50(¶ 7);
 
 Smith v. State,
 
 550 So.2d 406, 408 (Miss.1989). Ray was arraigned on August 18, 2005, and his trial finally occurred on February 21, 2008. Since the delay exceeds eight months, it is presumptively
 
 *424
 
 prejudicial, and the cause of the delay must be analyzed under the remaining
 
 Barker
 
 factors.
 

 B.Reason for the delay
 

 ¶ 22. “Once a delay is found to be presumptively prejudicial, the burden of proof shifts to the State to show cause for the delay.”
 
 Stark,
 
 911 So.2d at 450(¶ 11). The appellate court must determine whether the delay should be charged to the State or the defendant.
 
 Id.
 
 Since the burden is on the State to provide a defendant with a speedy trial, this factor is weighed against the State unless it can show either that the delay was caused by the defendant or that the delay was for a good cause.
 
 Id.; Wiley v. State,
 
 582 So.2d 1008, 1012 (Miss.1991).
 

 ¶ 23. The majority of the delay was the result of an agreed order for Ray to have a mental examination conducted by the Mississippi State Hospital. The agreed order granting the continuance for the examination was filed on September 2, 2005, and the authorities at the hospital notified the trial court on October 4, 2007, that Ray was competent to stand trial. The examination was delayed during that time due to the hospital’s assertion that they had not received certain information necessary to conduct the examination. Some of the information needed was to be provided by Ray and/or his attorney. While waiting for the mental examination, there were several “master orders of continuance” in the record as well as another agreed order of continuance filed on November 19, 2007, after the examination was completed. “Several occurrences may justify a delay in a criminal case, one of these being ‘well-taken’ motions for continuance.”
 
 Flora v. State,
 
 925 So.2d 797, 815(¶ 63) (Miss.2006). Although it took approximately two years for the competency examination to be completed, we cannot count that time against the State because Ray requested the examination. Ray also requested the November 19, 2007, continuance. We find that the delays were for good cause or mainly caused by Ray.
 

 C. Assertion of the right to speedy trial
 

 ¶ 24. On September 24, 2007, Ray filed a pro se motion to dismiss charges for failure to provide a speedy trial. On November 9, 2007, Ray’s attorney filed a motion for a speedy trial. On December 12, 2007, Ray filed a motion for a speedy trial. We note that Ray filed this last motion after his continuance had been granted and a trial date had been set for February 19, 2008. In
 
 Adams v. State,
 
 583 So.2d 165, 169-70 (Miss.1991), the supreme court held that a demand for dismissal coupled with a demand for instant trial was insufficient to weigh the third
 
 Barker
 
 prong in defendant’s favor where the motion came after the bulk of the delay had elapsed. Ray’s first motion to dismiss was filed over two years after he was indicted. Ray’s motion for a speedy trial was first filed ten days prior to seeking a continuance and next filed after a trial date had been set. We find this factor weighs against Ray.
 

 D. Prejudice to the Defendant
 

 ¶ 25. The supreme court has identified three main considerations in determining whether the accused has been prejudiced by a lengthy delay: “(1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired.”
 
 Jefferson v. State,
 
 818 So.2d 1099, 1108(¶ 21) (Miss.2002) (internal quotations omitted). “Generally, proof of prejudice entails the loss of evidence, death of witnesses, or staleness of an investigation.”
 
 Sharp v.
 
 
 *425
 

 State,
 
 786 So.2d 372, 381(¶ 19) (Miss.2001). Ray’s chief argument is that the delay of the competency examination amounts to oppressive pretrial incarceration. Ray contends that the letters he wrote complaining about his lengthy incarceration prove his anxiety and concern. Ray was incarcerated for a lengthy time, but it was a result of his request for a mental exam and the various requests for continuances. Ray also fails to point to any specific injury to his ability to prepare his defense.
 

 ¶ 26. While not considering lightly that a delay did exist, we recognize that: most of the delay was attributable to Ray; Ray filed his motions for a speedy trial after the bulk of time had elapsed; and Ray has failed to show he suffered any actual prejudice due to the delay. Thus, we cannot find that Ray’s constitutional right to a speedy trial was violated. This issue is without merit.
 

 VII. WAS RAY’S TRIAL COUNSEL INEFFECTIVE?
 

 ¶ 27. In his final issue on appeal, Ray contends that his trial counsel was ineffective. For a defendant to successfully prove ineffective assistance of counsel, the defendant must show that the counsel’s performance was deficient and that the deficient performance prejudiced the defense.
 
 Strickland v. Washington,
 
 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When a defendant raises an ineffective assistance of counsel claim on direct appeal, the question before this Court is whether the judge, as a matter of law, had a duty to declare a mistrial or order a new trial sua sponte on the basis of trial counsel’s performance.
 
 Colenburg v. State,
 
 735 So.2d 1099, 1102(¶ 8) (Miss.Ct.App.1999).
 

 ¶28. Ray claims that his trial counsel had never tried a murder case before being appointed to represent him and that the trial court should have appointed co-counsel to assist with the trial. The docket sheet shows that Donna Smith was appointed as co-counsel on October 13, 2005. Smith signed part of Ray’s patient information that was sent to the hospital and filed in the trial court on March 2, 2006. There is no other mention of Smith in the record or in the trial transcripts. Ray concedes that this objection on its face does not prove ineffective assistance of counsel, but that this fact is relevant to his other concerns.
 

 ¶29. Ray states that his trial counsel was ineffective in asking for a continuance on November 19, 2007. We fail to see how asking for a continuance in this instance constitutes a deficient performance. Even so, Ray fails to show how this prejudiced his defense.
 

 ¶ 30. Ray contends that his trial counsel was ineffective by conceding that Ray killed Hudson. However, since Ray’s defense was that he killed Hudson in self-defense, we find trial counsel’s statement to be a tactical decision. Ray finally contends that his trial counsel vouched for the credibility of Dr. Hayne’s testimony when trial counsel asked Dr. Hayne the following:
 

 I’m a country lawyer. And you’re a — if I might say — brilliant medical technologist or expert. Could you put this in language that Mama can understand? Can you tell me precisely — or where I can understand it and hopefully the ladies and gentlemen of the jury, did he just stick him?
 

 Ray’s trial counsel was asking Dr. Hayne to discuss the type of wound inflicted upon Hudson. We fail to see how this question to Dr. Hayne, the State’s expert who was accepted by the defense, shows a deficient performance by Ray’s trial counsel, much less any prejudice resulting therefrom. This issue is without merit.
 

 
 *426
 
 ¶ 31. THE JUDGMENT OF THE LOWNDES COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LOWNDES COUNTY.
 

 KING, C.J., MYERS, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.